# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# PINE BLUFF DIVISION

LISA F. DIXON                                                    PLAINTIFF

V.                             NO. 5:14CV00307-JTR

CAROLYN W. COLVIN,                                     DEFENDANT
Acting Commissioner,
Social Security Administration

## MEMORANDUM AND ORDER

Plaintiff, Lisa F. Dixon ("Dixon"), has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying her claim for Supplemental Security Income ("SSI"). Both parties have filed Appeal Briefs, *Docs. 13 & 14*, and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g).

## I. Background

Dixon was previously determined to be completely disabled in 1992 or 1993, when she was approximately twenty-six years old. (Tr. 36, 86.) Thereafter, she did not work and drew SSI disability benefits until 2009, when her benefits were terminated

because of her incarceration in the Arkansas Department of Correction ("ADC"). (Tr. 36-37, 62-63, 86.) Dixon was released from the ADC on October 11, 2010 (Tr. 36), and, on October 12, 2010, she filed a new application for SSI, alleging disability since December 1991, her original onset of disability date. (Tr. 230-35.) In her Disability Report-Adult, she stated that she was disabled because of scoliosis, asthma, a learning disability, migraines, heart problems, hepatitis C, and a fractured foot. (Tr. 297.)

On October 12, 2010, the date she filed the pending SSI application, Dixon was forty-three years old. (Tr. 26, 230.) She had completed the sixth grade and had never held a full-time job. (Tr. 61-62, 298.)

On April 12, 2011, Nancy Bunting, Ph.D., a psychologist, performed a consultative mental evaluation at the request of the first Administrative Law Judge ("ALJ") assigned to this case. (Tr. 638-43.) Dr. Bunting did not perform any objective testing and, based on her one-time subjective examination of Dixon, diagnosed her as having a "mathematics disorder," an "antisocial personality disorder," and "chronic pain by report." (Tr. 641.) With regard to Dixon's "adaptive functioning," Dr. Bunting concluded that Dixon: (1) was able to communicate and interact in a "socially adequate, if brusque, manner," and to communicate "in an intelligible and effective manner when she wanted to"; (2) had "some ability" to cope with the typical mental/cognitive demands of basic work-like tasks; (3) had "some ability" to deal with

the public, based on her behavior in the interview; (4) "probably ha[d] some ability" to deal with bosses and co-workers, based on her ability to follow the rules in prison; (5) could handle "some work stress or change"; (6) could follow instructions; (7) could attend and sustain concentration on basic tasks; and (8) had "some ability" to sustain persistence in completing tasks and to complete them within an acceptable time frame. (Tr. 642-43.)

On April 18, 2011, a state agency "reviewing consultant" prepared a Psychiatric Review Technique Form and Mental Residual Functional Capacity Assessment, which was based only on an examination of the medical evidence. (Tr. 649-66.) The consultant found that Dixon was "moderately" limited in some work-related mental abilities, but nonetheless could perform unskilled work. (Tr. 663-65.) On May 26, 2011, another state agency "reviewing consultant" affirmed those conclusions. (Tr. 688.) Both of those "reviewing consultants" based their findings primarily on Dr. Bunting's consultative mental evaluation of Dixon.

On June 27, 2011, Vann Smith, Ph.D., performed a Neuropsychological Evaluation at the request of Dixon's counsel. (Tr. 691-94.) After performing a "battery of neuropsychological screening tests," Dr. Smith found a "pattern of abnormal responses and pathgnomonic indices consistent with the presence of diffuse

organic brain dysfunction of moderate severity and static velocity."[1] (Tr. 692-93.)

Dr. Smith opined that Dixon was "disabled at this time" due to a "cognitive disorder, non-psychotic, secondary to general medical condition(s)," including "chronic, non-psychogenic, moderate ... poorly controlled pain." (Tr. 694.) Dr. Smith also completed a Mental Residual Functional Capacity Questionnaire. (Tr. 695-99.) In evaluating Dixon's "mental abilities and aptitudes needed to do unskilled work," Dr. Smith concluded that, in all categories, Dixon was "seriously limited" or "unable to meet competitive standards." (Tr. 697.)

After Dixon's claims were denied at the initial and reconsideration levels, she requested an administrative hearing. After that hearing (Tr. 34-52), the ALJ entered a decision holding that Dixon was not disabled. (Tr. 91-101.)[2]

---

[1]Dixon reported to Dr. Smith that she had "multiple" traumatic brain injuries with concussion. (Tr. 694.) It appears she was injured in a car wreck in 1981, where she was "knocked out for a matter of minutes" (Tr. 40, 42), and suffered another head injury when she was "head butted at age 16" (Tr. 568). All of these head injuries *long predated* Dixon's disability onset date of December 1991, which explains why there were no medical records to corroborate her testimony of multiple traumatic brain injuries. Nevertheless, the ALJ discounted Dr. Smith's opinion that Dixon's objective testing results were consistent with "diffuse organic brain dysfunction" because it "appears to be based on an incorrect medical history provided by the claimant." (Tr. 19-20, 26.) With *nothing* in the record from the long ago time in which Dixon claims she suffered those head injuries, it was impossible for the ALJ to know if the medical history Dixon reported to Dr. Smith was correct or not. Thus, the ALJ had *no factual basis* for discounting Dr. Smith's opinion or attacking Dixon's credibility for providing an "incorrect medical history" about her head injuries.

[2]The ALJ found that: (1) Dixon had only one "severe" impairment, obesity; (2) she did not have a "severe" impairment due to a long-standing back injury (which was one of the "severe" impairments that supported the initial determination, in 1992 or 1993, that Dixon was disabled); and (3) because her alleged mental impairments had "no more than a minimal effect" on her ability to do basic work activities, they were also "non-severe." (Tr. 96-97.) The ALJ's last finding that

On July 10, 2012, the Appeals Council reversed and remanded the ALJ's decision for "[f]urther evaluation as to the claimant's intellectual functioning" *and* "[f]urther consideration" of her severe personality disorder, which the evidence showed had "result[ed] in work-related limitations." (Tr. 107-10.) The Appeals Council directed the ALJ: (1) to obtain, "[a]s warranted," additional evidence concerning Dixon's mental impairments "in accordance with the regulatory standards regarding consultative examinations and existing medical evidence"; (2) to apply and document "the special technique for the evaluation of mental impairments"; (3) to reconsider Dixon's RFC; and (4) to obtain, "[i]f warranted," evidence from a vocational expert ("VE") to clarify the extent of the assessed limitations on Dixon's occupational base. (Tr. 108-09.)

On February 13, 2013, a new ALJ conducted an administrative hearing, where Dixon, a friend, and a VE testified. (Tr. 53-87.) During the hearing, Dixon's counsel asked the ALJ to order a new consultative psychological evaluation, because Dr. Bunting's evaluation was almost two years old and Dixon's emotional and mental problems had "gotten worse since then." (Tr. 57-58, 85-86.) While he stated that he would "certainly consider" the request, the ALJ did *not* act on it and ultimately used

---

Dixon's mental impairments had only a "minimal effect" on her ability to do basic work activities was in conflict with *both* Dr. Bunting's findings *and* Dr. Smith's findings. Thus, there was *no medical evidence* supporting the ALJ's determination that Dixon had *no mental impairments* that would affect her ability to do basic work activities.

Dr. Bunting's April 12, 2011 evaluation to support *all* of his findings regarding Dixon's "mental impairments." (Tr. 58, 86-87.)

In his March 29, 2013 decision, the ALJ found that Dixon: (1) had not engaged in substantial gainful activity since her application date; (2) had "severe" impairments consisting of obesity, antisocial personality disorder, and scoliosis; (3) did not have an impairment or combination of impairments meeting a Listing; (4) had the residual functional capacity ("RFC") to perform a modified range of light work, with no past relevant work; and (5) could perform jobs at the modified range of light work, which existed in significant numbers in the national economy, such as working as a "motel maid." (Tr. 13-28.) Accordingly, the ALJ concluded that Dixon was not disabled.

On June 17, 2014, the Appeals Council denied Dixon's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Tr. 1-4.) Dixon then filed her Complaint appealing that decision to this Court. *Doc. 2*.

In Dixon's Appeal Brief, she argues that the ALJ erred: (1) in failing to find that her migraine headaches were a "severe" impairment at Step 2 of his analysis; and (2) in failing to properly evaluate her mental impairments.

Because Dixon's second argument has merit, the ALJ's decision must be reversed and remanded. Accordingly, there is no need for the Court to address Dixon's first argument.

## II. Discussion

The ALJ bears the primary responsibility for assessing a claimant's RFC, which must be supported by *some medical evidence*.³ *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011). In assessing a claimant's functional capabilities, an ALJ may not draw his own inferences from medical reports. *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000); *see also Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009) (ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings"). An ALJ must not "substitute his opinions" for those of physicians. *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008). If the ALJ does not find any of the medical opinions credible, then he should develop the record further to include medical evidence of a claimant's limitations. *Flynn v. Astrue*, 513 F.3d 788, 792 (8th Cir. 2008).

In addition, the ALJ bears a responsibility to fairly and fully develop the record. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ is required to seek clarifying statements from a medical source if "a crucial issue is undeveloped" or if the sources' records do not provide an adequate basis for determining the merits of the disability claim. *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010). Finally, the ALJ

---

³RFC is defined as "the most [the claimant] can still do" in a work setting "on a regular and continuing basis" despite his or her physical and mental limitations. 20 C.F.R. § 416.945(a)-(c).

is required to order medical examinations and tests "if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Id.*

The ALJ found that Dixon had the mental RFC to perform unskilled, simple work: (1) where interpersonal contact is incidental to the work performed; (2) where the complexity of one to two step tasks is learned and performed by rote, with few variables and little judgment; (3) where the supervision required is simple, direct and concrete; and (4) which requires no more than a third-grade reading level. (Tr. 22, 25-26.) *See* 20 C.F.R. § 416.968(a) (defining unskilled work). Simply stated, the record does *not* contain substantial evidence to support the ALJ's mental RFC assessment. Additionally, the ALJ failed to discharge his duty to fully and fairly develop the record regarding Dixon's mental impairments.

First, in assessing the extent of Dixon's mental limitations, the ALJ: (1) gave "significant weight" to Dr. Bunting's entirely subjective April 12, 2011 consultative evaluation, which concluded that Dixon seemed to have "some ability" to work, despite her mental and cognitive difficulties; (2) gave "little weight" to Dr. Smith's consultative evaluation, which concluded, based on objective testing, that Dixon's "diffuse organic brain dysfunction" and "cognitive disorder" prevented her from performing any work; and (3) gave "some weight" to the non-examining "reviewing"

state agency consultants, who did nothing more than adopt Dr. Bunting's subjective findings. (Tr. 26.)

An objective review of Dr. Bunting's April 12, 2011 report reveals a number of serious flaws in her evaluation of Dixon's mental and cognitive difficulties.

First, after finding that Dixon had an "antisocial personality disorder," Dr. Bunting described the resulting limitations it could cause Dixon in a way that cast doubt on Dr. Bunting's "objectivity." For example, notwithstanding Dixon's antisocial personality disorder, Dr. Bunting found Dixon would be able to communicate and interact in a "socially adequate, *if brusque*" manner. (Tr. 643.) The Court has never seen a psychologist use the qualifying term "brusque" to describe how someone with an antisocial personality disorder interacts with others in a social or workplace context. How Dr. Bunting was able to divine, *based on a single interview*, that Dixon's interaction with others would be merely "brusque," rather than hostile or rude (terms more traditionally used to describe the interactions of those suffering from antisocial personality disorder), is a mystery.

Second, Dr. Bunting found that Dixon "*probably* ha[d] some ability" to deal with bosses and co-workers, based on her ability "to follow the rules in prison." (Tr. 643.) Surely, Dr. Bunting understands that a prisoner's ability "to follow the rules in prison" *has little, if any, predictive value* in evaluating how that prisoner will "deal

with bosses and co-workers" in a workplace setting – especially when the prisoner in question has a diagnosed antisocial personality disorder. Furthermore, *nothing* in Dr. Bunting's report suggests that she reviewed Dixon's disciplinary record in the ADC to determine if, in fact, she was generally able to follow prison rules. In short, Dr. Bunting's strained effort to cite Dixon's utterly unknown ability to "follow the rules in prison" as evidence that she "probably ha[d] some ability" to deal with bosses and co-workers, casts further doubt on the "objectivity" of her evaluation of Dixon.

Third, the fact that Dixon did not seek regular mental health treatment while incarcerated in the ADC is largely irrelevant to the determination of the nature and extent of her mental health issues. By and large, it is difficult for ADC prisoners like Dixon to receive mental health treatment, except for the most serious kinds of problems. Here, Dixon's "intake mental health screening," in January of 2010, showed no mental health concerns that required treatment or medication. (Tr. 568-69.) However, less than five months later, on May 14, 2010, Dixon asked to see a psychiatrist because she was having thoughts that were "not good," which probably meant thoughts of harming herself or others. (Tr. 567.) After talking with a health provider about her "thoughts and feelings," her mental status was found to be "within normal limits." (Tr. 567.) During the administrative hearing, Dixon testified that she did not receive any mental health treatment in prison because "they [prison officials]

said ... [she] was there short term." (Tr. 64.)

Finally, in quantifying the extent of Dixon's work-related abilities, Dr. Bunting subjectively found she appeared to have unlimited ability in some areas, and "some" or "probably ... some" ability in other areas. Dr. Bunting did not complete a mental RFC assessment form or correlate her "ratings" with the requirements of unskilled work. Based on a review of Dr. Bunting's report, the non-examining state "reviewing" psychologist completed a mental RFC assessment form, rating Dixon's abilities in twenty categories and determining that she could perform unskilled work. (Tr. 663-65.)

In contrast, using essentially the same mental RFC assessment checklist, Dr. Smith rated Dixon's abilities in the same categories and expressly found that she was unable to perform unskilled work. (Tr. 697-98.) Dr. Smith did so only after conducting numerous diagnostic tests and examining Dixon. The ALJ did not mention Dr. Smith's specific RFC findings, much less address the contrasting results from the state "reviewing" psychologist.

The Eighth Circuit has held "many times that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision." *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003). This is especially true where, as here, Dr. Bunting and Dr. Smith reached opposite

conclusions regarding the limitations imposed by Dixon's mental impairments.[4]

Similarly, the opinions of a "non-treating, non-examining physician" normally do not constitute substantial evidence to support an RFC assessment. *Vossen*, 612 F.3d at 1016; *Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002) (instead of developing record, ALJ "improperly relied on the report of a state consultant who did not examine" the claimant); *see* 20 C.F.R. § 416.927(c)(1). Here, the mental RFC assessments prepared by state "reviewing" psychologists, were based solely on the medical evidence in the record regarding Dixon's mental impairment, *which at that time consisted only of Dr. Bunting's report*. Neither of the state "reviewing" psychologists had the benefit of Dr. Smith's report and evaluation, which he prepared *after* they submitted their mental RFC assessments on Dixon.

Another deficiency in the ALJ's decision is that it does not adequately address the extent of Dixon's "intellectual functioning," one of the specific issues the Appeals Council directed the ALJ to fully develop on remand. (Tr. 108.) Dr. Bunting diagnosed Dixon with an unexplained "mathematics disorder" and found that her allegation of "learning disabilities" was "congruent with the results of the interview." (Tr. 641, 643.) However, Dr. Bunting performed no IQ testing and found only that

---

[4]As previously discussed, Dr. Smith's neuropsychological evaluation determined that Dixon's "diffuse organic brain dysfunction" and "cognitive disorder" limited her "capacity to carry out routine daily activities in a consistent manner," rendering her "disabled at this time." (Tr. 694.)

Dixon's intellectual functioning was not consistent with a mental retardation diagnosis. (Tr. 641.) Other evidence in the record indicates that Dixon's intellectual functioning is significantly more limited than reported by Dr. Bunting: (1) Dr. Smith found that Dixon had "reduced intellectual functioning," estimating her "native intelligence" to lie "within the borderline range" (Tr. 691, 698); (2) Dixon had, at most, a sixth grade education (Tr. 47-48, 61, 68-69, 298, 639); (3) she stated that she was "dumb" and had difficulty reading, writing and spelling (Tr. 41, 61, 323, 360, 638); and (4) she unsuccessfully attempted to get her GED at least four times (Tr. 38-39, 41, 61, 639).

At the administrative hearings, Dixon's attorney characterized her as "functionally illiterate" and argued that it was "obvious" that Dixon had a learning disability. (Tr. 40, 85.) He also stated that he believed an IQ test would show a Listing-level intellectual impairment. (Tr. 85.) The ALJ erred in failing to develop the record on this issue by ordering IQ testing, or other testing to clarify the extent to which Dixon's intellectual functioning is impaired.

Next, both Dr. Bunting and Dr. Smith relied substantially on Dixon's self-reports regarding her clinical history and level of functioning. Dr. Bunting expressed the opinion that Dixon was "not a reliable informant"; her cooperation and level of effort were "superficial and minimal"; and she "clearly exaggerated, if she did not

malinger" some of her complaints. (Tr. 642-43.) These subjective conclusions were based entirely on Dr. Bunting's one-time observations of Dixon during the interview. (*See* Tr. 638-40, 642-43.)

Dr. Smith, on the other hand, found Dixon to be "reliable" and "cooperative." (Tr. 691.) Unlike Dr. Bunting, Dr. Smith administered two tests to detect malingering[5] and expressly found, based on those objective test results, that Dixon was *not* a malingerer. (Tr. 698.) The ALJ never addressed Dr. Smith's well-supported finding that Dixon was not a malingerer. Instead, he cited medical records that indicated, on three occasions, emergency-room physicians believed Dixon was engaging in "drug-seeking behavior" in an effort to obtain narcotic medications. (Tr. 812-16, 830-32, 841-42.) While those medical records did not reflect well on Dixon's credibility, they were *not* evidence that she was a "malingerer." On remand, the ALJ must order a new consultative evaluation and ensure that it includes objective testing to determine if Dixon displays symptoms of exaggeration or malingering.

Like Dr. Bunting, the ALJ relied heavily on Dixon's *presumed* ability to work well and follow orders, *while in prison*, as evidence that she is able to work full-time

---

[5]The "Test of Memory Malingering" and the "REY Fifteen Item Memory Test." (Tr. 692-93.)

in the free world.[6] The Court fails to understand how the ALJ could cite Dixon's ability to fold prison laundry, *for an unspecified number of hours*, and her position as a "dorm clerk" (*work that was never described*) as evidence that she had the ability to work at a full-time job, in the free world. The ALJ's entirely speculative attempt to connect those dots is factually unsupportable and logically unsustainable.

The ALJ did not ask the VE about the physical and mental demands of Dixon's prison jobs. In fact, the only evidence regarding Dixon's work in prison was her response to the ALJ's inquiry about "what jobs ... they had you do" in the ADC: "Folding clothes, doing laundry, in the laundry department or a dorm clerk, where you sit and you try to keep up with everyone, they sign in and sign out and you give it to the officer and the officer, you know, back tracks you." (Tr. 61.) The ALJ erred in relying so heavily on Dixon's *unquantified* ability to perform these prison jobs, without exploring in detail precisely what she did and how many hours a week she performed those tasks.

As further justification for finding that Dixon did not have a disabling mental impairment, the ALJ relied on the lack of evidence in the record regarding mental

---

[6]To demonstrate just how much weight the ALJ gave to Dixon's prison job in the laundry, he ultimately found that one of the jobs Dixon could perform was "motel maid," presumably because she had "transferable experience" doing "something" in the prison laundry.

health concerns or treatment. Specifically, the ALJ stated that Dixon had not received any treatment for a personality disorder; was not taking psychotropic medication at the time of the second administrative hearing; and had "never" been diagnosed with a mood or anxiety disorder.[7] (Tr. 25.) An ALJ is required to explore whether a claimant's lack of mental health treatment is a manifestation of her mental illness, or evidence that she, in fact, is without psychosis. *See Pate-Fires*, 564 F.3d at 945-46. Here, Dixon's attorney specifically argued that, due to the nature of antisocial personality disorder, individuals like Dixon "rarely seek treatment voluntarily." *Doc. 13 at 13*. The ALJ should address all of these issues on remand.

Finally, the Court is troubled by the ALJ's casual dismissal of Dixon having drawn SSI disability benefits *for at least seventeen years* before her incarceration in 2009.[8] The current record is unclear regarding the basis for the Commissioner's

---

[7] The ALJ's statement that Dixon has "never" been diagnosed with a mood disorder is not supported by some of the evidence in the record. On October 15, 2007, Dixon presented to the Fulton County Hospital ER, stating that she was suicidal and wanted to "restart" depression medication and counseling. Dr. Phillips, an ER physician who had treated Dixon on many prior occasions for physical complaints, noted that she had been on Cymbalta and diagnosed her with "depression, chronic." (Tr. 908.) There are also references to prior psychiatric hospitalizations and suicide attempts. (Tr. 68, 568-69, 638-39.)

[8] The ALJ's decision states only that: "Ms. Dixon testified that she had received disability payments in the past, but they stopped when she went to prison." (Tr. 23.)

-16-

previous disability determination;[9] the length of Dixon's incarcerations; or the basis for termination or suspension of her benefits.[10] Although the prior finding of disability is certainly *not* binding,[11] it is relevant to a longitudinal evaluation of Dixon's impairments, most of which appear to be long-standing and chronic,[12] especially since

---

[9]Dixon testified that the disability determination was based on: back problems resulting from a 1981 motor vehicle accident and scoliosis; asthma; and uterine and throat cancer. (Tr. 41-42, 44, 67, 70-71.) Dixon's attorney stated, at the second administrative hearing, that he had no records regarding the prior determination. (Tr. 85-86.) Although he conceded that he was "speculat[ing]," he said he thought it was based on Dixon's back problems and headaches, combined with her mental impairments. (Tr. 86.) The record contains only an opinion from a chiropractor, dated April 15, 1993, that Dixon was "temporarily totally disabled" due to cerviobrachial syndrome, muscle spasm, scoliosis, and vertebrogenic pain syndrome. (Tr. 777.)

[10]Under Social Security regulations, a claimant's SSI benefits are suspended upon incarceration, and after twelve consecutive months of suspension, benefits are terminated. 20 C.F.R. § 416.1325, § 416.1335. Benefits are also suspended when a recipient is fleeing to avoid prosecution or custody, or is violating the conditions of probation or parole. *Id.* § 416.1339. It appears Dixon was incarcerated in the ADC twice: In 2003, for approximately one year (Tr. 62, 289); and, in 2009 and 2010, for about nine months (December 20, 2009 to October 11, 2010). (Tr. 36-37, 59, 62, 290-92.) According to Dixon, her benefits were wrongfully terminated after the second incarceration because it was for less than one year. (Tr. 62, 380.) However, she admitted that the second incarceration was due to a probation violation and that she "ran from [her] probation officer for ... almost two years." (Tr. 62.)

There is no evidence that Dixon timely requested review of the suspension or termination of her benefits. Instead, she filed a new SSI application.

[11]*See Ply v. Massanari*, 251 F.3d 777, 779 (8th Cir. 2001) (rejecting contention that ALJ was bound by previous findings under administrative res judicata; no inference is to be drawn from prior determination, which was based on claimant's condition "at that time"); *see Stubbs–Danielson v. Astrue*, 539 F.3d 1169, 1172 (9th Cir. 2008) (no presumption of continuing disability where benefits were terminated due to incarceration).

[12]Courts have ordered remand where the ALJ has failed to develop the record regarding a prior award of benefits which was suspended or terminated due to incarceration. *See Nelson v. Commissioner*, 2015 WL 3936939, at *8 (N.D.N.Y. June

the ALJ specifically relied on Dixon's medical records, dating back to 1993, to show the treatment she received during a period of time that she had been determined to be disabled.

## III. Conclusion

The record does not contain substantial medical evidence to support the ALJ's mental RFC assessment, and is replete with unaddressed evidentiary discrepancies and errors of law. On remand, the ALJ must fully and fairly develop the medical record by obtaining a fresh consultative psychological evaluation from another examining mental health specialist, who should perform all appropriate tests to make a comprehensive, objective determination of the level of Dixon's intellectual functioning and the nature and extent of her mental health problems that may affect

---

26, 2015) (on remand, "it would be prudent" for the ALJ to discuss claimant's previous disability claim "to determine what relevance, if any, it may have on her current claim"); *Rosebud v. Colvin*, 2015 WL 1481394, at *3-5 (E.D. Ky. Mar. 31, 2015) (ALJ failed to develop the record regarding the nature, dates and basis for claimant's prior benefits award and termination due to incarceration); *Smith v. Astrue*, 2012 WL 5268712, at *3-6 (S.D. Ohio Oct. 23, 2012) (remanding in light of factual ambiguities regarding claimant's prior award and termination of benefits due to incarceration); *Bonner v. Astrue*, 725 F. Supp. 2d 898, 900-02 (C.D. Cal. 2010) (remanding because ALJ failed to develop record regarding claimant's prior award of SSI benefits and termination due to incarceration); *Bragg v. Commissioner*, 2011 WL 1374067, at *3-6 (E.D. Mich. 2011) (remanding because ALJ failed to inquire into and address the effect of claimant's prior award of benefits and termination due to incarceration).

her ability to perform work-related activities. The ALJ must supplement the record regarding the basis for Dixon's prior disability determination, including any still available supporting medical records. Finally, the ALJ must update Dixon's medical records with any new treatment she has received and any related diagnostic testing. After carefully considering all of the foregoing medical evidence, the ALJ must then re-evaluate the entire record, formulate a new RFC assessment, and proceed through the sequential evaluation.

IT IS THEREFORE ORDERED that the final decision of the Commissioner is REVERSED and this matter is REMANDED to the Commissioner for further proceedings pursuant to "sentence four," within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 1st day of March, 2016.

_____
UNITED STATES MAGISTRATE JUDGE